**Anwar ROLLE, Appellant**

v.

**Derick LeJohn HARDY, Appellee**

**NO. 01-16-00402-CV**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued June 1, 2017

Felishia R. Young, Monica Rawlins, 5100 Westheimer Rd., Ste. 200, Houston, TX 77047, for Appellant.

Donnica Blackful, 14090 Southwest Freeway, Suite 300, Sugar Land, TX 77478, for Appellee.

Panel consists of Justices Keyes, Bland, and Huddle.

## OPINION

Evelyn V. Keyes, Justice

This is a child custody case regarding the conservatorship of two children, R.H. and D.T.H., whose mother passed away. Appellant, Anwar Rolle, is the children's maternal uncle, and he petitioned the trial

court to name him the sole managing conservator of the children. The children's father, Derick LeJohn Hardy, who was a joint managing conservator of the children at the time of their mother's death, moved to dismiss Rolle's suit on the basis that he could not establish standing to maintain his claim. The trial court found that Rolle failed to demonstrate by "satisfactory proof to the court that ... the order requested is necessary because the [children's] present circumstances would significantly impair [their] physical health or emotional development. ..." *See* TEX. FAM. CODE ANN. § 102.004(a)(1) (West 2014).

In his sole issue on appeal, Rolle challenges the trial court's ruling, arguing that (1) he presented "satisfactory proof" that the order requested in his petition was necessary because the children's present circumstances would significantly impair their physical health or emotional development. Rolle further argues that (2) the trial court erred to the extent that it required him to establish "immediate harm" to the children and (3) in effectively requiring him to "overcome the parental presumption" and (4) to establish his success on the ultimate merits of his case.

Because it appears from the record that the trial court did not properly apply the standard of proof in evaluating whether Rolle had standing to pursue a modification of the children's conservatorship order under section 102.004(a)(1), we reverse the trial court's order dismissing Rolle's petition and remand the case for further proceedings consistent with this opinion.

## Background

R.H., born January 10, 2006, and D.T.H., born December 8, 2010, are the subjects of this suit. Their mother, Cortina Rolle ("Mother"), and their father, Hardy, were appointed joint managing conservators of the children in 2012, with Mother having the right to designate the children's primary residence. Accordingly, the children resided with Mother from the time of their births.

On September 6, 2015, Mother, who had cancer, died. At that time, R.H. was nine years old and D.T.H. was four years old. Hardy subsequently took over the day-to-day care of the children. He brought the children, who had previously had significant interaction with Mother's family, and especially Rolle and his wife, for a one-hour visit with Rolle on September 8, 2015. However, Hardy refused to bring the children to visit with Rolle's cousin, who was a hospice therapist, and he did not bring the children to Mother's memorial service that occurred at the end of September 2015.

On September 29, 2015, Rolle filed a petition to modify the parent-child relationship requesting that he be appointed sole managing conservator of the children. Rolle supported his petition with an affidavit in which he averred that Mother had requested that Rolle and his wife care for the children in the event of her death and stated that he and his wife had been very active in the children's lives. He also described the events following Cortina Rolle's death that caused him concern regarding Hardy's taking custody of the children. He alleged that Hardy had failed to support the children financially, that he had never been involved in the children's lives prior to Mother's death, and that he was not providing the children with proper emotional support or living arrangements.

Hardy moved to dismiss Rolle's petition for lack of standing, arguing that Rolle "cannot show under Texas Family Code § 102.004 that the children's present circumstances would significantly impair the children's physical health or emotional development."

At the hearing on standing, Rolle and Hardy both testified. Rolle testified that he had lived in the same home with Mother and the children for a few years, until he moved out when D.T.H. was approximately one year old. Mother and her children subsequently moved out of the family home to live with her fiancé, with whom Mother had a third child, C.L.[1]

Even after he moved, Rolle maintained a close relationship with his nieces. Rolle testified that the children were very close with Mother and with her family and that they spent holidays and birthdays together and spent time together on the weekends. Rolle testified that prior to Mother's death, he was very involved in the children's lives, including helping R.H. with her school work. Rolle stated that, prior to his helping R.H., she had had to repeat the second grade, but after he worked with her, she "received the most-improved student award." He testified that during the 2014-2015 school year, he worked with Mother to begin the process of having R.H. evaluated for her dyslexia and that the process "takes almost a year." He stated that at the end of the 2014-2015 school year the school informed Mother that it had officially diagnosed R.H. with dyslexia, and it scheduled a formal meeting for the beginning of the next school year. Rolle had planned to attend this meeting with Mother when the 2015-2016 school year started, but Mother passed away on September 6, 2015. Rolle testified that Hardy did not sign the papers for the school to proceed with providing special services to R.H. for her dyslexia. Rolle also acknowledged that the girls' school counselor testified that R.H.'s grades had improved over the course of the semester, although she was still failing at least one class.

Rolle also stated that Hardy did not visit the children regularly prior to Mother's

death or provide financial support for them, and he provided documentation that Hardy owed child support arrears for R.H. and D.T.H. and others of his ten children and that Hardy had been named in several different child support enforcement actions. Rolle was surprised when, on the afternoon of Mother's death, Hardy's mother picked R.H. and D.T.H. up from Mother's apartment, where they had been staying with Mother's roommate. Rolle stated that Hardy never told anyone in Mother's family what he was doing. Rolle testified that Hardy also refused to provide counseling for the children, that he waited "a few days" to tell the children their mother had died, and that he had allowed only limited contact between the children and Mother's family.

Rolle also testified that the day after Mother's death he received a phone call from Hardy asking whether Mother had a life insurance policy. Rolle believed that Hardy "only wants these kids for money." Rolle and Hardy were able to arrange for the children to visit with Rolle and his wife two days after Mother's death, but the visit was only one hour long. Rolle testified that R.H. was unusually withdrawn and quiet, although he also acknowledged that, at that point, she knew her mother had died so she could have been upset about that. Rolle testified that the girls were in pajamas that day, that they appeared "disheveled," and that their hair was not combed. He reached out to Hardy "numerous times" to arrange other meetings with the girls and to have them attend Mother's memorial service, but Hardy refused.

Rolle further testified that Hardy was receiving social security benefits for the children and had completed that paperwork in September 2015, even though Hardy had failed to complete the necessary

---

1.  C.L. is not a subject of this suit.

school paper work to get R.H. educational accommodations. Rolle also did not believe that Hardy was using the social security money appropriately because his nieces were not wearing appropriate clothing when he saw them at Thanksgiving—neither had on a jacket, one had no underwear, and the other had on "a boy's shoes that belonged to her cousin . . . and the shoes were too big."

Finally, Rolle testified that Hardy represented himself as being a barber, but Rolle could not find any indication that Hardy had obtained a license to work as a barber in Texas. Rolle also testified that he was concerned about Hardy's criminal background, "[b]ecause Mr. Hardy has a background of cocaine, multiple weapons, assault with a deadly weapon. . . . And I know that my sister told me [in 2013 or 2014] that he sold weed from the barbershop." Rolle was also concerned about Hardy's living arrangements. He testified that, at the time he filed his petition, he did not know where Hardy was living or if his living arrangements were appropriate for the children. Rolle further stated that, when he visited with the children at Thanksgiving, R.H. could not tell him where she lived.

Other family members and friends of Mother's testified at the hearing as well, and their testimony was largely similar to Rolle's. Rolle's wife, Deanna Davis-Rolle, testified about the close relationship between the children, Mother, and Mother's family. And she also expressed concerns about Hardy's failure to adequately provide for the children or be involved in their lives. Her testimony concerning the circumstances surrounding Mother's death recounted similar events to those provided by Rolle.

Davis-Rolle stated that on the afternoon of Mother's death, Hardy, his mother, and his sister returned to Mother's home without the children. He informed them that the children "are his kids and no one was going to take his kids." She agreed with Rolle that, on September 8, 2015, the children "were just very quiet and withdrawn," which, based on her previous interactions with them "was very different for them." R.H. in particular was less outspoken and "was unsure of what she wanted to say to us, almost that she had been coached." When asked to describe the children's physical appearance during this meeting arranged by Rolle and Hardy, Davis-Rolle testified that R.H. was in her pajamas. And she testified that, during their Thanksgiving visit, D.T.H. repeatedly cried and asked about her mother and that R.H. was very withdrawn, stating, "She would go into periods of being happy, to being very sad and crying hysterically, shaking in my husband's arms."

Davis-Rolle stated that, based on her knowledge of the children, it would have been in their best interest to receive some type of grief counseling, but to the best of her knowledge, Hardy had not taken the children to any kind of counseling. She also testified that she was concerned about their emotional well-being generally, stating, "For [children] to be withdrawn from everything that they know in an instant is very concerning to me. I'm concerned about their emotional stability, both short term and long term, because I feel like they will feel abandoned by a family, the only family that they knew." She did not believe it was in the children's best interest for Hardy to have taken them away from Mother's family.

Mother's friend, Cherisse Rutherford, also testified. Like the Rolles, she was familiar with the children and with Hardy. Rutherford testified that the children were very close with Mother, while Hardy had had limited interaction with the children prior to Mother's death. She stated that

Hardy's sister would occasionally pick the children up so they could play with their cousins; in contrast, Mother's family, and especially Rolle and his wife, were "involved in those children's lives every single day," helping Mother pick them up from school and attending their birthday parties and special events.

Rutherford testified that when Mother found out that she had cancer, she reached out to Hardy to let him know and tell him that she wanted Rolle to care for her children. According to Rutherford, Hardy asked Mother, "Well, what the 'F' do you want me to do?" and "hung up in her face." Rutherford believed that, in the weeks before her death, Hardy's sister kept the children for a few days. Mother wanted the children to "spend time with their cousins and she needed a day or two break." Rutherford was also concerned for the children's emotional well-being since they have been unable to see Mother's side of the family.

Cornelius Foster, Rolle's stepfather, testified that Mother and her children had lived with him and his wife for a period of time. He stated that the children had a "wonderful" relationship with Mother and were very bonded to her. In the two or more years that Mother lived with him following D.T.H.'s birth, he only saw Hardy on one occasion, when Hardy came over to bring money for supplies for the baby. Foster also stated that Rolle was close to his nieces and saw them regularly before Mother's death. Foster acknowledged that Mother would take the children over to Hardy's mother's home, and he testified that he had "no idea what happened there" or whether Hardy ever saw the children somewhere else besides his or Mother's home.

Hardy also testified. He stated that he first learned that R.H. was his child when she was approximately four years old, and

he "immediately got inside [R.H.'s] life." He stated that he was involved in both girls' lives from that time to the present. He testified that Mother would bring the girls by the shop where he worked and "[i]f they need[ed] anything, [Mother] would get money from me." He also disagreed with Rolle's testimony that he had never been over to Mother's family's home, testifying that he had been there on "plenty of occasions." Hardy testified that he saw the children regularly before Mother's death when she would bring the children to visit him and on birthdays and other occasions, and he presented some photographs of himself with Mother, R.H., and D.T.H., as well as photographs of him and the children following Mother's death. He acknowledged that he was behind on his child support payments, but he also testified that he gave money and other support to Mother directly.

Hardy testified that he had five previous convictions, and his criminal background was admitted into evidence. His last conviction was in 2015, when he was arrested for being a felon in possession of a firearm. He testified that he had left work with a large amount of cash from the shop and took a firearm for protection. He testified that he was currently on probation for that offense and that he was abiding by all of the terms of his probation. He also stated that he had never carried a weapon or committed any crimes while the children were in his care. Hardy's other convictions, including a 2001 misdemeanor weapons charge and a 2002 felony possession of cocaine charge, all occurred prior to R.H.'s birth. Hardy also testified that he was "taking care of" his child support arrearages.

Regarding his obtaining custody of the children, Hardy stated that, after he and Mother discussed her cancer diagnosis, they discussed plans for the children. Har-

dy testified that, in the summer of 2015, Mother expressed a desire to have the children come stay with him. He testified that they started living with him in August 2015, just around the time school started. Hardy stated that he took the children back to Mother in the week before she died so that the kids could spend some time with their mother. He testified that he was worried about her health, and he denied ever being dismissive of her diagnosis. He specifically denied that he ever asked her, "What the 'F' do you want me to do about that?" when she first told him of her diagnosis.

After Mother's death, Hardy had his mother go pick the children up from Mother's home. He testified that they were "distraught and they [were] mad." He asked his mom to go pick them up because he felt like they needed to be with their father. He went to pay his respects to Mother, then he went to be with his children. Hardy also denied that the first conversation he had with Rolle following Mother's death was about her insurance policy, and he stated that he asked about the insurance policy because he "wanted to know did she have a proper burial."

Hardy also testified that he did not bring the children to Mother's memorial service because he had heard that her family had had a family meeting and were discussing trying to take the children away from him. And he testified that he was conflicted about his decision to keep them from the memorial service. He testified that on one hand, it might have been good for the girls to pay respects, but on the other hand, he did not think it would have provided the closure the girls were looking for and "probably would have made it even worse."

Hardy stated that he first took the children to spend time with Rolle just after Mother's death, and he asked R.H. how long she wanted to visit. R.H. did not want to spend the night and asked to spend one hour with her aunt and uncle, so that is what Hardy arranged with Rolle. Hardy acknowledged that the children were very upset by their mother's passing, but he spent time with them trying to console them. He stated that he "did family functions" with them, that R.H. started Girl Scouts, that he took them on trips and let them visit with their other siblings. He chose to "[k]eep them busy" as way of dealing with their grief and not pressure them to talk to him, stating that he preferred for them to initiate the discussions. Hardy testified that he did not arrange any counseling for the children because he felt like they were "good" and "happy." He stated that they talked to him sometimes, and he testified, "Now ... if they hadn't progress[ed] between when [their] mom passed and now or before the end of last year, ... then I would have [sought] counseling for them if it was necessary."

Hardy denied filing for any social security benefits on the children's behalf, but he stated he did receive SNAP benefits.[2] He testified that he was currently supporting the children through his barbershop and through a janitorial service that he had started. He testified that he did not cut hair at the barbershop, but he was involved in the operation of the business. He also stated that the children lived with him, that he got them ready for school each morning, and he spent every afternoon and evening after school with them. He testified that he took care of their hair, clothing, and hygiene needs, and he disagreed with Rolle's and others' testimony that the children were unkempt or improp-

---

**2.** SNAP stands for Supplemental Nutritional Assistance Program. Hardy testified that this program helped provide him with grocery money.

erly dressed. He also testified that R.H.'s performance at school had improved as the school year progressed, between when the school-year started and the time that Rolle filed his suit. He also testified that he signed the form for R.H. to obtain educational services for her dyslexia "once [he] found it." Hardy testified that he originally did not sign the form because he did not know R.H. had it, but once he knew to look for it, he found it in R.H.'s school papers and signed it. He also denied missing an appointment with the school counselor, stating "I didn't know we had an appointment." He testified that the school counselor approached him outside the school while he was there to pick up R.H., told him about the paperwork, and talked to him about some other things. Hardy testified that he "had a lot going on" between Mother's death and the girls coming to live with him, but things were more settled at the time of the hearing and they were "great now."

Hardy testified that he had no intention of keeping the children from Mother's side of the family, "[b]ut one thing I can't stand in my kids' life is a lot of chaos, drama, you know. And then I'm spending unnecessary money up on this right here and it could be used towards my kids. And that's my thing, I tried to come to some type of agreement once before." He testified that he was willing for Rolle to "[b]e uncle and call and say, can I see the kids or do you mind if I see the kids on this day right here or whatever," but he did not like the feuding over who would serve as the children's conservator.

Hardy's grandmother, Gloria Lofton-Vallair, testified that she had known R.H. and D.T.H. "since [Hardy] found out that he was the children's dad," which "was a little before the mom was sick." She testified about the times she had observed interactions between Hardy and his chil-

dren. She testified that prior to their mother's passing, Hardy had visited with the children "sometimes" and that she had observed Hardy with his children "at least 20 times" before September 2015, including for occasional over-night visits. After Mother's death, Lofton-Vallair spent time with Hardy and the children over Christmas and on other occasions like "cookouts, picnics, birthday parties" and other holidays and events. She testified that she had observed Hardy interact with R.H. and D.T.H. since he had gotten custody of them in 2015, after Mother's death, and that Hardy was loving and took care of his kids. She stated that the children always appeared "happy" with their father and that they were "[n]eatly dressed, hair combed, clean, bathed, everything." Lofton-Vallair also observed Hardy support his kids financially by purchasing clothing, toiletries, and toys. Lofton-Vallair also testified that the children had been staying with their father since Mother's death and that they also visited occasionally with Hardy's mother. She testified that Hardy's home had two bedrooms and that the children's room was "a nice room," with carpet, beds, draperies, wall hangings, and toys. She also stated that the home in general was well-kept and clean.

Lofton-Vallair testified that the only concern she had for the children was "the fact that their mother had passed away" because she knew "that would be a devastating thing for them." She testified that, before their mother passed away, the girls "were joyful children," but after they "were quiet for a while, because they were trying to, you know, understand what was going [on]. The oldest, she kind of understood a little bit what was going on. And [Hardy] would try to explain to them, you know, what had happened." She testified that over time, she saw improvement in their emotional states, in that they would smile more and were happier.

Laturischeva Holmes testified that she was the mother of Hardy's oldest child, A.H., who was fifteen at the time of the hearing. She stated that she had known R.H. and D.T.H. for about five years. Holmes testified that she observed Hardy with R.H. and D.T.H. "a few times" prior to Mother's passing, and her daughter, A.H., reported seeing her sisters during her visits with Hardy. The last time Holmes saw Mother was about a month before her death when she ran into her by chance. Holmes "asked [Mother] how was the girls and she told me that they were with [Hardy] and that they were doing good."

Holmes stated that she saw the children numerous times in 2015 after Mother's death, either while they were with Hardy visiting his mom or were "in the car with him getting ready to go to his house." She stated that they were happy, "like normal kids," stating that "they enjoy being around their other cousins and playing and talking. And they love on their dad all the time, not just them, but all the kids." She further stated that they were always clean and had their hair done. Holmes testified that Hardy was behind in his support payments for A.H., but she also testified that he sometimes paid support directly to her rather than making payments through the Attorney General's Disbursement Unit, especially when A.H. needed something for school and could not wait for the Attorney General to forward the payment. Holmes also testified that Hardy had a two-bedroom condo, that R.H. and D.T.H. shared a room, and that the home was clean and well-kept.

At the end of the hearing, the trial court stated on the record that the case presented a "close call." The trial court also stated that "this is not a best interest standard," and that "whether I think [Rolle] can do a better job ... raising these kids is not the standard." The trial court recognized the importance of the children having Mother's family, including Rolle—who, according to the trial court, had "been a consistent force for quite some time in their lives" and had "been a good influence for them for quite some time"—involved in their lives.

The trial court made findings that it recorded on the docket sheet. *See, e.g., Haut v. Green Café Mgmt., Inc.*, 376 S.W.3d 171, 178–79 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (entries on docket sheets may not be used to contradict trial court orders and are generally not considered to be trial court orders or findings, but docket entries may be used by appellate courts to determine what transpired in trial court).

In its findings on the docket sheet, the trial court found that standing "is a threshold issue in a custody proceeding" and that this case was governed by the standard set out in section 102.004(a)(1), requiring Rolle to provide "satisfactory proof that an order appointing him as the sole managing conservator of the child[ren] is necessary because the children's present circumstances in the care of [Hardy] would significantly impair [their] physical or emotional development." The trial court found that the "satisfactory proof must exist on the date the suit was filed (9/29/15)" and that the trial court "cannot consider what may happen in the future." The trial court stated, "the evidence submitted must be considered in the light most favorable to the Petitioner [Rolle] and must enable reasonable and fair minded people to find that the requested order is necessary because the children's circumstances on that day significantly impair their physical health or emotional development."

The trial court further found that "[s]ignificant impairment is not established be-

cause the children were not in counseling three weeks after their mother's death"; that "[e]vidence of parole violations that have unknown future consequences cannot be considered"; that "[d]iscretionary educational recommendations not acted upon in the immediate aftermath of their mother's death does not demonstrate a significant impairment to the children on 9/29/15"; and that Rolle failed to present direct evidence of the children's appearance as of September 29, 2015. The trial court found that Rolle failed to meet the burden set forth in Family Code section 102.004(a)(1) and granted Hardy's motion to dismiss for lack of standing. This appeal followed.

## Standing

In his sole issue on appeal, Rolle complains that the trial court erred in concluding that he failed to establish standing under Texas Family Code section 102.004(a)(1).

### A. Standard of Proof of Standing Under Section 102.004(a)(1)

■ Standing is implicit in the concept of subject-matter jurisdiction, and it is a threshold issue in a child custody proceeding. *Mauldin v. Clements*, 428 S.W.3d 247, 262 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993)). Whether a party has standing to pursue a cause of action is a question of law that we review de novo. *Id.* (citing *In re SSJ–J*, 153 S.W.3d 132,

134 (Tex. App.—San Antonio 2004, no pet.)).

■ In ordinary circumstances, "standing is based on the existence of certain facts, not the existence of certain proof." *In re K.D.H.*, 426 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004) (holding, in context of standing in general civil case, that in determining whether pleader has alleged facts affirmatively demonstrating court's jurisdiction, we construe pleadings liberally in favor of plaintiff and consider relevant evidence submitted by parties when necessary to resolve jurisdictional issues raised). However, when, as here, questions of standing impact a parent's right to make decisions about how to best care for his children free from interference by nonparents, the Texas Legislature has set out a different standard. *See In re L.D.F.*, 445 S.W.3d 823, 829 (Tex. App.—El Paso 2014, no pet.); *see also Troxel v. Granville*, 530 U.S. 57, 72–73, 120 S.Ct. 2054, 2063–64, 147 L.Ed.2d 49 (2000) (holding that, absent evidence that parents are not adequately caring for child, Due Process Clause protects parents' decisions from being interfered with by government officials).

■ The Texas Family Code provides standing for a relative within the third degree of consanguinity to file suit requesting managing conservatorship [3] "if there is satisfactory proof to the court that ... the order requested is necessary because the child's present circumstances would significantly impair the child's phys-

---

**3.** We note that, because Rolle is the children's maternal uncle and not a grandparent, he could not seek visitation or access under Family Code section 153.432, permitting a "biological or adoptive grandparent [to] request possession of or access to a grandchild ... without regard to whether the appointment of a managing conservator is an issue in the suit." *See* TEX. FAM. CODE ANN. § 153.432(a)–(b) (West 2014). However, in cases in which standing is granted pursuant to section 102.004—the section at issue here—nothing in the statute prevents a trial court from granting possession and access to a nonparent without naming that nonparent as a managing conservator.

ical health or emotional development[.]" TEX. FAM. CODE ANN. § 102.004(a)(1). Thus, section 102.004(a)(1) "is an unusual provision because, in it, the Texas Legislature confers standing on certain parties based on the existence of proof" rather than on the pleading of facts. *In re K.D.H.*, 426 S.W.3d at 885.

As the children's uncle, Rolle is within the third degree of consanguinity to them. Therefore, we turn to whether he established his standing to pursue a modification of the children's conservatorship order under the standard of proof set out in section 102.004(a)(1).

## B. Applicability of the Parental Presumption to Proceedings Under Section 102.004(a)(1)

Rolle argues in part that the trial court's standing ruling was erroneous because it improperly required him to overcome the parental presumption set out in Family Code section 153.131.

Family Code section 153.131 provides a presumption that "a parent shall be appointed sole managing conservator" of a child "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a) (West 2014); *see id.* § 153.131(b) (providing that this is rebuttable presumption and that "[a] finding of a history of family violence involving the parents of a child removes the presumption under this subsection").

Section 153.131's parental presumption applies only in original custody disputes— it does not apply to modification suits, such as the one Rolle has filed here. *See In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000); *Mauldin*, 428 S.W.3d at 266–67. However, the "significant impairment" language in

section 153.131 mirrors the relevant language in section 102.004(a)(1), the section that Rolle relies upon to confer him standing to sue for modification of the trial court's previous order appointing Hardy as a managing conservator. *See* TEX. FAM. CODE ANN. §§ 102.004(a)(1), 153.131(a).

Under section 102.004(a)(1), Rolle must make a similar showing to establish his standing to pursue his petition to modify the children's conservatorship order as a nonparent must make to overcome the presumption in section 153.131 that a parent is to be named managing conservator. *See In re L.D.F.*, 445 S.W.3d at 829; *Mauldin*, 428 S.W.3d at 267. This "jurisdictional requirement of standing helps ensure that a parent's constitutional rights are not needlessly interfered with through litigation." *In re L.D.F.*, 445 S.W.3d at 829 (quoting *In re Russell*, 321 S.W.3d 846, 857 (Tex. App.—Fort Worth 2010, orig. proceeding)).

Accordingly, a party seeking standing in a suit affecting the parent-child relationship pursuant to section 102.004(a)(1) is required to establish standing with "satisfactory proof" that "the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 102.004(a); *Compton v. Pfannenstiel*, 428 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Mauldin*, 428 S.W.3d at 263 (stating that we use statutory framework provided by Family Code to determine grandparent's standing to intervene under section 102.004); *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.) ("When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis.").

We conclude, therefore, that, to establish his standing to seek managing conservatorship of the children, Rolle was required to establish by "satisfactory proof" that, under the circumstances present at the time of the conservatorship modification proceedings, the children's continuing in their "present circumstances," i.e., in the sole managing conservatorship of their father, Hardy, would "significantly impair" their physical health or emotional development.

### C. "Satisfactory Proof" That Modification of Conservatorship is Necessary

Rolle argues that he provided " 'satisfactory' proof to the court that ... the order requested [was] necessary because the [children's] present circumstances would significantly impair [their] physical health or emotional development...." *See* Tex. Fam. Code Ann. § 102.004(a)(1).

Following its consideration of the evidence presented during the hearing, the trial court stated that "the evidence submitted must be considered in the light most favorable to the Petitioner [Rolle] and must enable reasonable and fair minded people to find that the requested order is necessary because the children's circumstances on that day significantly impair their physical health or emotional development." Rolle argues that less proof is required to satisfy the "reasonable and fair-minded people" standard of proof for standing than would be required to prove his suit on the merits, citing the Fourteenth Court of Appeal's decision in *In re K.D.H. See* 426 S.W.3d at 887 (holding that trial court must "determine whether the evidence submitted regarding the standing issue, considered in the light most favorable to the petitioner, would enable reasonable and fair-minded people to find that the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development").

First, we observe that *In re K.D.H.*, which addressed a grandmother's standing to bring an original suit requesting managing conservatorship, is distinguishable from the present case, which involves a modification of the trial court's previous order naming the children's now-deceased Mother and Hardy as joint managing conservators. *See id.* at 883. Second, this Court has previously held in construing section 102.004(a)(1) that "satisfactory proof" is "proof established by a preponderance of the evidence as the facts existed at the time the suit or intervention was filed." *Compton*, 428 S.W.3d at 885 (citing *In re McDaniel*, 408 S.W.3d 389, 397 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding)); *Mauldin*, 428 S.W.3d at 263 ("In a family law case, when the petitioner is statutorily required to establish standing with 'satisfactory proof,' the evidentiary standard is preponderance of the evidence."). The burden of proof is on the party asserting standing, and the petitioner must show that the facts establishing standing existed at the time the petition was filed in the trial court. *Mauldin*, 428 S.W.3d at 263; *In re Vogel*, 261 S.W.3d 917, 921 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (standing is determined as of time that suit was filed in trial court). If the plaintiff fails to establish proper standing, then the trial court must dismiss the suit. *Compton*, 428 S.W.3d at 885.

In *Compton*, a panel of this Court held that while we review determinations of standing de novo, we consider the trial court's findings of fact in support of its conclusion on standing under Family Code section 102.004(a) as we would other necessary factual determinations made by a fact finder. *See id.* at 885 (holding that we consider evidence in light favorable to trial

court's ruling); *see also Mauldin*, 428 S.W.3d at 262–63 (holding, as part of de novo review of standing under section 102.004, that we review entire record to determine if trial court's implied findings are supported by any evidence); *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd) (same).

■ Furthermore, employing the less-stringent standard of proof asserted by Rolle—which would require that courts view evidence in the light most favorable to the nonparent and would require only more than a mere scintilla of evidence to permit a nonparent's interference with a parent's rights to his child through litigation—does not comport with the purposes of section 102.004(a)(1). As discussed above, and as recognized by the Fourteenth Court of Appeals in *In re K.D.H.*, section 102.004(a)(1) is not a typical standing provision. 426 S.W.3d at 885. Section 102.004(a)(1) requires "satisfactory proof" of substantial impairment to the children and not merely the pleading of facts. *Compare* Tex. Fam. Code Ann. § 102.004(a)(1), *with, e.g., id.* § 102.003 (West Supp. 2016) (setting out general standing provisions for filing suits affecting parent-child relationship); *Mauldin*, 428 S.W.3d at 263 (stating that we use statutory framework provided by Family Code to determine grandparent's standing to intervene under section 102.004); *Everett*, 178 S.W.3d at 851 ("When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis.").

This "jurisdictional requirement of standing helps ensure that a parent's constitutional rights are not needlessly interfered with through litigation." *In re L.D.F.*, 445 S.W.3d at 829; *see Troxel*, 530 U.S. at 72–73, 120 S.Ct. at 2063–64 (holding that, absent evidence that parents are not adequately caring for child, Due Pro-

cess Clause protects parents' decisions from being interfered with by government officials). And it serves a similar role in protecting parental interests from improper interference in modification suits as section 153.131's parental presumption serves in original suits. *See* Tex. Fam. Code Ann. §§ 102.004(a)(1), 153.131(a); *In re L.D.F.*, 445 S.W.3d at 829; *Mauldin*, 428 S.W.3d at 267 (holding that, although section 153.131's presumption did not apply in that case, grandparents were required to establish that mother's appointment as managing conservator would significantly impair children's emotional or physical wellbeing in order to have standing to pursue modification of trial court's order).

Rolle argues, however, that requiring him to establish by a preponderance of the evidence that the order requested is necessary because the children's present circumstances would significantly impair their physical health of emotional development requires him to establish his case on the merits. This is incorrect.

■ It is true that, generally, challenges to standing are determined as a matter of law and ought not address the underlying merits of a claim. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *In re SSJ-J*, 153 S.W.3d at 137–38 (determining that merits were not relevant in context of challenge to standing under Family Code section 102.003(a)(9), which requires pleading of particular facts—that person had actual care, control, and possession of child for at least six months within 90 days before filing of petition—to establish jurisdiction). That does not mean that evidence cannot be offered in connection with a challenge to standing. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. As discussed above, Family Code section 102.004(a)(1) is a unique standing provision in that it actually requires proof of specific facts that may

also be relevant to the underlying merits of the case. But there is no evidence at this stage in the proceedings upon which the trial court could determine what type or degree of access or possession of the children should be awarded Rolle on the merits should he be permitted to continue with his lawsuit. That determination would still have to wait further development of the case and a determination and final order following an evidentiary hearing or trial on the merits.

■ Rolle has filed suit to modify the trial court's prior order regarding conservatorship of the children. *See* TEX. FAM. CODE ANN. § 156.002(b) (West 2014) ("A person or entity who, at the time of filing, has standing to sue under Chapter 102 may file a suit for modification in the court with continuing, exclusive jurisdiction."). To succeed in obtaining modification, Rolle must establish one of the grounds for modification set out in section 156.101, *i.e.*, he must prove that modification is in the children's best interest and that the circumstances of the children, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the last order. *Id.* § 156.101(a)(1) (West 2014); *see* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016) (setting out thirteen factors to be considered in evaluating parent's willingness and ability to provide child with safe environment, including child's age and physical and mental vulnerabilities; frequency and nature of out-of-home placements; magnitude, frequency, and circumstances of harm to child; results of psychiatric, psychological, or developmental evaluations of child and other family members; history of abuse or substance abuse; willingness of family to effect positive environmental and personal changes; and ability to demonstrate adequate parenting skills and

provide children with minimally adequate health care and nutrition, care, guidance, and safety); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (setting out non-exclusive list of factors trial court may consider in making determinations regarding conservatorship, including desires of child, present and future physical emotional needs of child, present and future physical and emotional danger to child, parental abilities of people seeking custody, stability of home or proposed placement, and acts or omissions of parent that may indicating inappropriate parent-child relationship). We review a trial court's order regarding conservatorship for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

We agree with Rolle to the extent that he is arguing that, at this stage of the proceedings, he need not present proof sufficient to prevail on his underlying claim seeking to modify the trial court's 2012 order naming Hardy as the children's joint managing conservator—he need not establish that naming him as their conservator would be in their best interest or that their circumstances have materially changed. However, to bring his modification suit, he was required to establish that he had standing under Family Code Chapter 102. *See* TEX. FAM. CODE ANN. § 156.002(b). Standing under section 102.004(a)(1), the section at issue here, requires "sufficient proof" that his order is necessary because the children's circumstances would significantly impair their physical health or emotional development. *See id.* § 102.004(a)(1); *Compton*, 428 S.W.3d at 885. This is a narrower inquiry than a broad "best interest" determination, and, as discussed above, it was designed to protect a parent's rights to make decisions regarding their children free from improper interference of nonparents in the form of litigation. *See In re L.D.F.*, 445 S.W.3d at 829.

For the foregoing reasons, we reject Rolle's claim that requiring him to prove by a preponderance of the evidence that the order permitting him to intervene is necessary because the children's present circumstances would significantly impair their physical health or emotional development requires him to prove the merits of his suit.

### D. "Immediate Harm" as the Standard of Proof of Present Circumstances Justifying Intervention

Finally, Rolle argues that the trial court erred by essentially requiring him to prove that the children faced actual "immediate harm." We agree with Rolle that the trial court erred in construing and applying the standard of proof of his standing to intervene.

To establish standing here, Rolle was required to show by a preponderance of the evidence that "some specific, identifiable behavior or conduct" of Hardy's would probably cause significant impairment to the children's physical health or emotional development. *See In re L.D.F.*, 445 S.W.3d at 830; *Mauldin*, 428 S.W.3d at 263; *see also* TEX. FAM. CODE ANN. § 102.004(a)(1). " '[P]hysical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent' are all factors the trial court may consider in assessing significant impairment." *In re L.D.F.*, 445 S.W.3d at 830; *see Compton*, 428 S.W.3d at 885 (considering grandmother's evidence of parent's "drug use, recent criminal arrests, and extreme neglect of her children during the preceding eight months" as factors relevant to standing analysis); *In re Vogel*, 261 S.W.3d at 922 (evidence that there was strong relationship of child with mother who died, that father took child from funeral without notifying custodial grandmother, that father was long-term alcohol-

ic, that father was unable to provide for child's financial needs, and that it would be "harmful" for child to live with father was evidence of substantial impairment establishing standing).

However, "evidence that 'merely raises a surmise or speculation of possible harm' is insufficient to establish" an inference that "the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed." *Mauldin*, 428 S.W.3d at 263 (quoting *In re S.M.D.*, 329 S.W.3d at 16); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also Chavez v. Chavez*, 148 S.W.3d 449, 458 (Tex. App.—El Paso 2004, no pet.) (link between parent's conduct and any harm to children may not be based on mere surmise or speculation of possible harm). A nonparent cannot meet his burden by evidence showing that he would be a better custodian of the children, that he has a strong and ongoing relationship with the children, or that the parent would not have been a proper custodian in the past. *Mauldin*, 428 S.W.3d at 263; *In re S.M.D.*, 329 S.W.3d at 16 (citing *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.)); *see Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *Chavez*, 148 S.W.3d at 458; *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling.").

Rolle contends that he established satisfactory proof of significant impairment of the girls' physical health or emotional development based in part on his testimony that Hardy was not caring properly for their emotional or educational needs. In

concluding that Rolle did not meet his burden of providing satisfactory proof that his requested order was necessary because the children's present circumstances would significantly impair their physical health or emotional development, the trial court determined that "[s]ignificant impairment is not established because the children were not in counseling three weeks after their mother's death" and that "[d]iscretionary educational recommendations not acted upon in the immediate aftermath of their mother's death does not demonstrate a significant impairment to the children on 9/29/15." The record supports these determinations.

Although Rolle and Davis-Rolle testified about their concerns regarding Hardy's failure to take the children to counseling in the immediate aftermath of their mother's death and his failure to sign required school forms or attend a meeting with the school counselor, Hardy provided contradicting testimony. Hardy testified that he did not take the children for counseling because he did not believe they needed it, and he instead spent time with them, keeping them occupied and providing opportunities for them to speak with him when they needed to. He testified that if he had not seen improvement in their emotional state over the weeks following Mother's death, he would have sought counseling. Rolle presented no evidence to support a conclusion that Hardy's approach to helping the children with the aftermath of Mother's death contributed to any emotional harm. The record likewise demonstrates that although R.H. continued to struggle academically (as she had prior to Mother's death), her grades were already improving by the end of September 2015. Hardy also testified that once he understood that he needed to sign paperwork for R.H.'s dyslexia accommodations, he did so. There was no evidence that Hardy's actions or inactions in this regard constituted

a risk of significant impairment of R.H.'s or D.T.H.'s physical or emotional wellbeing.

However, Rolle also argues that the trial court failed to consider evidence of Hardy's past conduct toward the children, Hardy's criminal history, and Hardy's current inability to meet the children's needs. The evidence at trial established that Hardy had had five previous convictions for various offenses such as the illegal possession of drugs and weapons. His most recent conviction was in 2015, when he was arrested for being a felon in possession of a firearm. Hardy testified that he worked at a barber shop helping with the operation of the business, but he did not work as a barber. He had left work with a large amount of cash from the shop and took a firearm for protection when he was pulled over by police. At the time of the hearing, he was serving probation for this offense.

■ The record reflects that the trial court misconstrued both the standard of proof of standing to intervene in a modification of conservatorship proceeding and the scope of the evidence it was required to consider in determining Rolle's standing.

In its findings on the docket sheet, the trial court found that this case was governed by the standard of proof set out in section 102.004(a)(1). However, it construed section 102.004(a)(1) as requiring Rolle to provide "satisfactory proof that an order appointing him as the *sole managing conservator* of the child[ren] is necessary because the children's present circumstances in the care of [Hardy] would significantly impair [their] physical or emotional development." (Emphasis added.) This does not accurately reflect the nature of Rolle's pleadings or the requirements to establish standing pursuant to section 102.004(a)(1). For Rolle to have standing to

pursue his petition seeking a modification of the children's conservatorship, the trial court had to find it necessary to reassess the children's conservatorship order because their present circumstances in the *sole managing conservatorship*—not merely "care"—of Hardy would significantly impair their physical health or emotional development. Rolle was not required, pursuant to section 102.004(a)(1), to establish that he should be appointed as sole managing conservator of the children in order to have standing to seek a modification of the conservatorship order. Whether Rolle should be appointed a sole or joint managing conservator, a possessory conservator, or whether he should be granted any visitation or possession rights at all, is relevant to the merits underlying his petition. That question was not properly before the trial court in making its standing determination.

In order to make the determination whether being in the sole managing conservatorship of Hardy without access to Rolle would significantly impair the physical health or emotional development of the children, the trial court was required to consider all of the relevant factors set forth above. These factors include Hardy's history of caring for R.H. and D.T.H. and his other children, the dynamics of R.H.'s and D.T.H.'s relationship with Mother, Mother's family, and Hardy, Hardy's work history and demonstrated ability to meet the children's needs, and his criminal history. *See, e.g., In re L.D.F.*, 445 S.W.3d at 830 (considering "specific, identifiable behavior or conduct" that would cause significant impairment to children's physical health or emotional development, such as abuse, neglect, abandonment, substance abuse, or immoral behavior); *Compton*, 428 S.W.3d at 885 (considering "drug use, recent criminal arrests, and extreme neglect of her children during the preceding eight months"); *In re Vogel*, 261 S.W.3d at 922

(considering evidence of strong relationship between child and deceased mother, father's parenting decisions that were not in child's best interest, long-term alcoholism, and inability to provide for financial needs).

Such a determination necessarily entails drawing reasonable inferences from the evidence of both past and current behavior that Hardy exhibited towards the children and their needs going forward. Yet the trial court expressly found that the "satisfactory proof must exist on the date the suit was filed (9/29/15)," which the court determined by looking solely to how the children appeared to be doing on that one day after three weeks in their father's care. The trial court stated, "the evidence submitted must be considered in the light most favorable to the Petitioner [Rolle] and must enable reasonable and fair minded people to find that the requested order is necessary because the children's circumstances *on that day* significantly impair their physical health or emotional development." (Emphasis added.) And it further stated, "I cannot consider what may happen in the future." This is incorrect, and an improper application of the standard of review, which requires drawing reasonable inferences from the record.

To take just one example, while evidence supporting standing must raise more than "a surmise or speculation of possible harm," *Mauldin*, 428 S.W.3d at 263, courts routinely consider the instability that a parent's criminal activity can cause for his children. *See, e.g., In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (engaging in criminal conduct subjects children to uncertainty and instability because of the probability that parent will be jailed thereby leaving children alone). Here, however, the trial court dismissed Hardy's extensive criminal background

and the fact that he was on probation for a felony offense at the time of trial by stating only that "[e]vidence of parole violations that have unknown future consequences cannot be considered."

Likewise, while standing must exist at the time Rolle filed his suit, all of the past actions or omissions of the parties are relevant to the children's circumstances as of September 29, 2015, and the trial court did not make any findings regarding the significance of Hardy's past neglect of the children. *See, e.g., In re L.D.F.*, 445 S.W.3d at 830; *see also* Tex. Fam. Code Ann. § 153.002 (West 2014) (providing that matters that relate to questions of conservatorship, possession, and access to children are to be based primarily on children's best interests); *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002) (same). Rolle and other witnesses from Mother's side of the family testified that they had concerns regarding R.H.'s and D.T.H.'s circumstances in September 2015 because Hardy had a history of failing to support his children and failing to be involved in their lives. They further testified that Hardy refused to allow contact between Mother's extended family, including Rolle, and the children. Rolle and others testified this presented a risk to the children's emotional development because Mother's family had been a significant part of their lives prior to Mother's death.

Although Hardy testified that, from the time Mother informed him that he was the father of R.H., he was involved in his children's lives on a regular basis, he also acknowledged that he was in arrears on his child support obligations to R.H. and D.T.H. prior to Mother's death and that he was also in arrears regarding support due to the mothers of his other eight children. The trial court had named Hardy as the children's joint managing conservator in 2012, but Hardy did not engage in any significant amount of the children's day-to-day care until August 2015, just prior to Mother's death and the filing of this lawsuit in September 2015.

There was minimal evidence regarding Hardy's present care of the children, as he had only been their primary caregiver for just a few weeks at the time Rolle filed his petition, and there was no evidence that Hardy was neglecting the children or otherwise failing to provide for their needs as of September 29, 2015. But there was evidence that he had repeatedly failed to meet his duties as their parent in the past and that at least some of their care had been provided by Rolle and his wife. *See In re L.D.F.*, 445 S.W.3d at 830 (recognizing that "an adult's future conduct may be somewhat determined by recent past conduct"); *Chavez*, 148 S.W.3d at 458–59 (holding that "safety, security, and stability are critical to child development," and thus "the danger of uprooting a child may in some instances rise to a level that significantly impairs the child's emotional development"). And the court expressly refused to consider Hardy's plans for the physical health and emotional development of the children in the future as predicated upon the past as it manifested itself at the time of the conservatorship hearing.

We sustain Rolle's complaint on appeal, and conclude that the trial court did not apply the standard of proof correctly in making its standing determination under section 102.004(a)(1). Accordingly, we reverse the trial court's order. Because an inquiry under section 102.004(a)(1) is necessarily fact-intensive, and, here, relies on issues of credibility and demeanor, we remand the case to the trial court to reconsider the issue of Rolle's standing in light of this opinion. *See In re M.J.C.*, 248 S.W.3d 753, 758 (Tex. App.—Fort Worth 2008, no pet.) (fact questions regarding standing must be resolved by factfinder);

*cf. Shook v. Gray*, 381 S.W.3d 540, 543 (Tex. 2012) (holding, in context of court of appeals's reversal on merits of conservatorship determination and subsequent remand limiting trial court's ability to consider grandparent—who had established general standing to intervene in suit—as conservator, that trial court must be able to consider changed circumstances so that it can fulfill its obligation of protecting child's best interest).

### Conclusion

We reverse the order of the trial court dismissing Rolle's petition and remand for further proceedings consistent with this opinion.