

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-18-00404-CV

---

IN RE CHRISTOPHER JOHN CLAY

---

Original Proceeding
Trial Court No. 16-07061-16

---

Before Gabriel, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

In this mandamus action, relator Christopher John Clay complains of the trial court's denial of his motions to strike the intervention petitions filed by real parties in interest Gary Jackson, Cheryl Jackson, and John Dumas in a suit affecting the parent-child relationship (SAPCR) regarding Clay's young daughter Ann.[1]  Clay argues that the real parties in interest failed to establish their statutory standing to intervene.  We agree that the Jacksons did not establish their standing to intervene by a preponderance of the evidence.  But we conclude that Dumas sufficiently established his standing under section 102.003(a) of the family code.  Thus, we grant in part Clay's mandamus petition as it relates to the Jacksons.

## I.  BACKGROUND

Clay and Dylan Arli Wilkes lived together beginning in 2011, and Ann was born in 2014; Clay and Wilkes never married.  The Jacksons are Ann's maternal grandparents.  Clay and Wilkes stopped living together in August 2016.  On September 1, 2016, Clay filed a SAPCR, alleging that he and Wilkes "are or will be separated" and requesting an order for conservatorship, possession, and access as Ann's biological father.  On October 18, 2016, the trial court entered an agreed order appointing Wilkes and Clay as joint managing conservators of Ann and giving Wilkes

---

[1]In their mandamus pleadings, Clay and the real parties in interest redacted Clay's daughter's name but used their full names.  We follow their lead and identify Clay's daughter by a fictitious name.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8 cmt.

the right to designate Ann's primary residence. The order gave Clay possession of Ann every second and fourth Thursday evening through Friday evening;[2] every first, third, and fifth weekend; fourteen days in the summer; and alternate holidays.[3] The trial court also ordered Clay to pay monthly child support to Wilkes.

On August 28, 2017, Wilkes notified Clay that she and Ann would be moving to Dumas's home "by the end of September" 2017. Dumas and the Jacksons stated that Wilkes and Ann moved in with Dumas in August, but some evidence indicated that they did not move until late September. Dumas believed that he was Ann's stepfather "for all intents and purposes" at that time. Ann referred to Dumas's daughters as her sisters and called Dumas "Pops."

On January 10, 2018, Wilkes filed a petition to modify the custody order, seeking an increased amount of child support based on a material and substantial change in Ann's circumstances and because the previously ordered amount, which had been agreed, did not comply with the family code. Clay answered and asked that Wilkes's modification request be denied. Dumas later argued that before Wilkes sought to modify Clay's child-support obligation, Clay "travelled quite a bit and

---

[2]When Ann turned three in 2017, this provision was expanded from every second and fourth Thursday evening through Friday to every second and fourth Wednesday evening through Friday.

[3]Clay describes this schedule as "close to a 50/50 possession schedule"; the Jacksons and Dumas argue that the agreed schedule was "slightly less than expanded standard possession."

3

missed quite a bit of his agreed-upon time." Clay recognized that he missed some of his scheduled possession, but he and Wilkes worked together in an attempt to make up the missed days.

Wilkes and Dumas became engaged in April 2018 and planned to marry in October 2018. Wilkes died in a tragic car accident on July 11, 2018. When she died, she and Ann lived with Dumas, but Wilkes and Dumas had not married. Ann never lived with the Jacksons. Since Wilkes's death, Ann has been living with Clay and his wife.[4] Ann has had reduced contact with the Jacksons and almost no contact with Dumas.

On July 18, 2018, one week after Wilkes died, Clay filed a motion in the pending SAPCR to terminate his child-support obligations and to dismiss the case. On July 27, the Jacksons filed a petition in intervention, which they amended on September 10, seeking to be named Ann's joint managing conservators with Clay or, alternatively, to be awarded "periods of possession." They alleged that Clay's sole managing conservatorship would not be in Ann's best interest because it "would significantly impair [her] physical health or emotional development." To justify their standing, the Jacksons specifically relied on family code section 102.004 or, alternatively, on section 153.433(b). On August 29—less than ninety days after Wilkes's death—Dumas also filed a petition in intervention, which he amended on

---

[4]Clay married his wife after Wilkes's death.

September 10, seeking to be named a joint managing conservator of Ann along with Clay. He also alleged that Ann's physical health or emotional development would be significantly impaired if Clay continued as her sole managing conservator. Dumas relied on family code section 102.003(a)(9) and (a)(11) to establish his standing to intervene. Clay filed motions to strike the intervention petitions, arguing that neither the Jacksons nor Dumas had established standing, which divested the trial court of subject-matter jurisdiction.

In September, the Jacksons filed an original application in probate court to establish a management trust for Ann's estate. Ann was the beneficiary of Wilkes's life-insurance policy, which was valued at $400,000. In response, Clay filed an application to be named the permanent guardian of Ann's estate.[5] The Jacksons opposed Clay's application, arguing that he "seems dead set on obtaining additional money to help him discharge his parental obligations" and that a less restrictive alternative than Clay being named guardian of Ann's estate was available—a management trust. The probate court held a hearing on Clay's guardianship application on October 1, but neither the mandamus record nor the parties indicate whether the probate court ruled on the application or whether the application is still pending.

---

[5]Clay initially sought to have the SAPCR transferred to the probate court but later withdrew that request.

On October 15, the trial court held an evidentiary hearing on Clay's motions to strike and signed an order denying them on November 20. No party requested findings of fact and conclusions of law. *See* Tex. R. Civ. P. 296. The Jacksons and Dumas then requested temporary orders naming Dumas and Clay joint managing conservators of Ann with the joint right to designate her primary residence and jointly awarding Dumas and the Jacksons the possession time Wilkes had been awarded in the agreed custody order. The Jacksons did not request temporary conservatorship. On December 4, the trial court notified the parties that it had set the Jacksons and Dumas's motion for a January 2019 hearing.

On December 11, Clay filed a mandamus petition requesting an emergency stay of the trial court's proceedings and complaining of the trial court's order denying his motions to strike the intervention petitions. We requested a response from the Jacksons and Dumas and granted Clay's emergency motion, staying all trial-court proceedings. *See* Tex. R. App. P. 52.8(b), 52.10(b). In his petition, Clay argues that the trial court clearly abused its discretion by failing to dismiss the intervention petitions for a lack of standing and that allowing Dumas's intervention violated his constitutional right to parent Ann.

## II. AVAILABILITY OF REMEDY

Generally, mandamus is available if the trial court violates a duty imposed by law or clearly abuses its discretion, either in determining the controlling legal principles or by applying the law to the facts, when there is no adequate remedy at

6

law.  *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding).  A trial court has no discretion in determining what the law is or in applying the law to the particular facts.  *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).

As particularly relevant here, "[m]andamus relief is permissible when a trial court abuses its discretion by erroneously denying a motion to strike a petition in intervention."  *In re O'Quinn*, 355 S.W.3d 857, 861–62 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding [mand. denied]); *see In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (orig. proceeding) (per curiam).  *See generally Rolle v. Hardy*, 527 S.W.3d 405, 419 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (stating appellate court reviews chapter 102 standing of nonparent to seek motion to modify conservatorship for abuse of discretion).  And because "an order denying a motion to dismiss for lack of standing in a [SAPCR] is not appealable," there is no adequate remedy at law.  *In re McDaniel*, 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding) (citing *In re Roxsane R.*, 249 S.W.3d 764, 775 (Tex. App.—Fort Worth 2008, orig. proceeding)); *see In re L.F.*, No. 02-17-00310-CV, 2017 WL 4684025, at *3 (Tex. App.—Fort Worth Oct. 19, 2017, orig. proceeding) (mem. op.).  Therefore, if the trial court clearly misapplied the law regarding subject-matter jurisdiction in ruling on the Jacksons' and Dumas's intervention petitions, we may appropriately issue a writ of mandamus.  *See Derzapf*, 219 S.W.3d at 333; *In re Shifflet*, 462 S.W.3d 528, 541–42 (Tex. App.—Houston [1st Dist.] 2015, orig. proceeding); *see also In re Tex. Dep't of*

7

*Family & Protective Servs.*, 210 S.W.3d 609, 613 (Tex. 2006) (orig. proceeding) (op. on reh'g) (acknowledging appeal frequently is inadequate remedy in child-custody cases).

### III.  STANDING

Standing is a component of subject-matter jurisdiction and is a constitutional prerequisite to maintain suit.  *See In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018); *In re M.K.S.-V.*, 301 S.W.3d 460, 463 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g). Standing in a SAPCR is governed by the family code.  *See In re E.G.L.*, 378 S.W.3d 542, 547 (Tex. App.—Dallas 2012, pet. denied).  As a question of law, we review standing de novo. *Rolle*, 527 S.W.3d at 415.

A party seeking relief in a SAPCR must allege and establish standing within the parameters of the language used in the relevant statute.  *See In re Tinker*, 549 S.W.3d 747, 751 (Tex. App.—Waco 2017, orig. proceeding [mand. denied]); *In re G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, at *2 (Tex. App.—Fort Worth June 18, 2015, no pet.) (en banc) (mem. op. on reconsideration).  "If a party fails to do so, the trial court must dismiss the suit." *Tinker*, 549 S.W.3d at 751.  But if the Jacksons or Dumas raised a fact question regarding the jurisdictional issue, the trial court cannot dismiss their intervention petitions for lack of standing.  *See Shifflet*, 462 S.W.3d at 538. It becomes a fact issue for the factfinder to determine at a trial on the merits of an intervention petition. *See H.S.*, 550 S.W.3d at 162*; In re M.J.G.*, 248 S.W.3d 753, 758 (Tex. App.—Fort Worth 2008, no pet.); *see also In re SSJ-J*, 153 S.W.3d 132, 137–38 (Tex. App.—San Antonio 2004, no pet.) (recognizing that standing under section

102.003 "does not mean the right to win; it is only a right to be heard" and that intervenor nevertheless "must still overcome the parental presumption" on the merits of managing-conservatorship claim against parent). *See generally* Tex. Fam. Code Ann. § 153.131 (supplying presumption that parent shall be appointed sole managing conservator unless such appointment would significantly impair child). Because the trial court did not enter, and no party requested, findings and conclusions regarding the denial of Clay's motions to strike, we must draw every reasonable inference supported by the record in support of the trial court's ruling. *See In re I.I.G.T.*, 412 S.W.3d 803, 808 (Tex. App.—Dallas 2013, no pet.).

## A. THE JACKSONS

### 1. Section 102.004

The Jacksons primarily alleged that they had standing under family code section 102.004.[6] That section would give them standing to intervene and request joint managing conservatorship with Clay, as opposed to possession or access, if they had "substantial past contact" with Ann and produced "satisfactory proof" that such conservatorship "is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development." Tex. Fam.

---

[6]We note that section 102.004(a) addresses standing regarding grandparents who file an original suit requesting managing conservatorship. Tex. Fam. Code Ann. § 102.004(a). The Jacksons sought leave to intervene in a pending SAPCR, which is governed by section 102.004(b). *See In re Schnick*, No. 04-18-00839-CV, 2018 WL 6624380, at *3 (Tex. App.—San Antonio Dec. 19, 2018, orig. proceeding).

Code Ann. § 102.004(b)(1); *see Derzapf*, 219 S.W.3d at 332 n.10. Satisfactory proof is a preponderance of the evidence existing at the time the Jacksons sought to intervene. *See Shifflet*, 462 S.W.3d at 537; *see also Rolle*, 527 S.W.3d at 417.

Generally in a determination of whether standing was established, appellate courts review the record in the light most favorable to the party attempting to establish standing. *See Rolle*, 527 S.W.3d at 415. But because section 102.004 attempts to protect a parent's constitutional right to parent free from interference, that light is turned off, and we review the entire record for satisfactory proof, i.e., a preponderance, to support the trial court's inferred finding that at the time the Jacksons filed their intervention petition, Ann's circumstances—Clay's sole managing conservatorship—would significantly impair her physical health or emotional development. *See id.* at 415–18. In short, the burden of proof remained on the Jacksons to show their standing by a preponderance of the evidence. *See id.* at 417–18.

And while we must defer to all record-supported and reasonable inferences in support of the trial court's ruling, section 102.004 "places a very heavy threshold burden on a grandparent seeking to intervene in a SAPCR." *Whitworth v. Whitworth*, 222 S.W.3d 616, 645 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g); *see I.I.G.T.*, 412 S.W.3d at 808. This burden required the Jacksons to show by a preponderance some specific, identifiable behavior or conduct by Clay that would significantly impair Ann physically or emotionally. *See Rolle*, 527 S.W.3d at 420. This

is more than evidence that the grandparents would be "better" managing conservators than the parent or that the grandparents have a strong relationship with the child. *See id.* In short, the focus is on Ann and her physical and emotional development, not the effect of Clay's sole managing conservatorship on the Jacksons. *See In re Russell*, 321 S.W.3d 846, 863 (Tex. App.—Fort Worth 2010, orig. proceeding [mand. denied]).

In Cheryl's declaration, which was attached to the Jacksons' intervention petition, she stated that she had been a "full time component" of Ann's life since Ann's birth:

> I care for [Ann] when she is not in school [because both Wilkes and Clay worked outside the home]. She frequently spent the night with us. . . . [Ann] and I have both a morning and an evening routine. I have taken her to or attended medical appointments. I have fed, clothed and bathed [Ann]. I have comforted her when she is hurt and am especially concerned for her now.

After Wilkes's death, the Jacksons, Dumas, and Clay met with a counselor who "firm[ly]" and "with great conviction" told them that "the most important thing" for Ann in the wake of Wilkes's death was to "retain her routine and to be with the people she knew." Even so, Cheryl declared that Clay "chipped away at [the Jacksons' and Dumas's] access" to Ann and indicated to Cheryl in July 2018 that he would withdraw Ann from her current preschool for convenience, further reducing the amount of time the Jacksons would see Ann. Clay also told Cheryl that he might move to Corpus Christi to be near his family.

11

At the October 2018 hearing on Clay's motions to strike the intervention petitions, the counselor verified that she had said that maintaining Ann's routine was important. During her meeting with the Jacksons, Dumas, and Clay, the counselor recounted that Dumas stated he and Wilkes previously had no issues with Clay's parenting but that Gary stated he did not like Clay and never would. The counselor stated that at the meeting, it seemed that the four were "working together" in Ann's best interest. The counselor also had previously counseled Clay and Wilkes about Clay's "parenting issues" and suggested that Clay take parenting classes "to help him gain a healthy understanding of best practices to effectively interact with, discipline, and care for his 3 year old child." One such issue was that Clay was spanking Ann. Approximately one month after Wilkes's death, Clay told the counselor that he was going to change counselors, and she told him that Ann was in a good place "therapeutically" by that time.

Cheryl testified at the hearing to many of the facts she included in her declaration, averring that she had been Ann's primary caregiver and that Gary had participated in Ann's care. Cheryl disputed Clay's assertion that his possession schedule with Wilkes was 50/50, and pointed out that for most of Ann's milestones—sitting up unaided and taking her first steps—she was with Cheryl. Cheryl pointed out that Ann saw Clay's family in Corpus Christi only about four times a year.

After Wilkes's death, Clay allowed the Jacksons to continue keeping Ann in the afternoons; but after they filed their intervention petition and requested a

12

management trust, Clay told them that he was putting Ann at a different, full-time preschool and that he had informed the preschool to not allow the Jacksons to pick up Ann. When Clay allowed the Jacksons to see Ann, Cheryl became concerned for Ann: "She has come to me [twice] with clothes too tight, shoes so small that they hurt her feet.[7] She is becoming withdrawn and sad. She's losing her self-confidence. She has nightmares. She seems happy, and then she'll suddenly break down in tears for no reason." But Cheryl admitted that she never alleged that Clay was not fit to be a joint managing conservator and that Clay had allowed her to spend "a lot of time" with Ann since Wilkes's death. She requested that she and Gary be allowed to step into Wilkes's shoes and have the same possession schedule Wilkes had with Clay before her death. Cheryl also testified that Clay's questions to her about how to care for Ann showed he was a good parent.

Clay testified that he has been actively involved in Ann's life and denied that he completely cut the Jacksons out of her life after Wilkes died. After the Jacksons intervened in the SAPCR and sought a management trust for Ann's estate, Clay told them that he would be ferrying Ann to preschool himself "due to the current proceedings." He stated that it was important to him that the Jacksons remain in Ann's life. He testified that he changed Ann's counselor because he wanted someone

---

[7]Ann's clothes remained in Ann's room at Dumas's house after Wilkes's death.

who specialized in child trauma, which the former counselor did not. Clay noted that Ann was "doing great" and had shown a lot of improvement since Wilkes's death.

This evidence is less than a preponderance that Clay's sole managing conservatorship would significantly impair Ann's physical health or emotional development. *See generally In re L.D.F.*, 445 S.W.3d 823, 830 (Tex. App.—El Paso 2014, no pet.) (recognizing standard for intervenor to establish standing under section 102.004 is a "high bar"). The counselor verified that it was very important for Ann to keep her routine and be with familiar people, but she also stated that when Clay took Ann to a different counselor in August 2018, Ann was in a good place therapeutically. Cheryl was concerned for Ann's wellbeing and noted that she wore too small clothes and had nightmares, but she agreed that Clay should be a joint managing conservator and that he was a good parent. And the Jacksons' involvement in caring for Ann before Wilkes's death does not supply the needed quantum of evidence regarding standing absent evidence that Clay's sole managing conservatorship would significantly impair Ann. *See* Tex. Fam. Code Ann. § 102.004(b) (conferring standing on grandparent with "substantial past contact with child" to intervene in pending SAPCR only with proof of substantial impairment); *cf. H.S.*, 550 S.W.3d at 156 (noting general standing statute in section 102.003(a)(9) does not confer standing on nonparents "who do not share a principal residence with a child for the statutory time period . . . regardless of how extensively they participate in caring for her"). The evidence in this case does not equate to satisfactory proof that Clay's sole managing

conservatorship would significantly impair Ann's physical health or emotional development, raising only a suspicion of possible harm. *See, e.g., Rolle*, 527 S.W.3d at 420, 422–23; *In re H.L.*, No. 02-14-00388-CV, 2016 WL 354080, at *5 (Tex. App.—Fort Worth Jan. 28, 2016, pet. denied) (mem. op.); *Russell*, 321 S.W.3d at 863; *cf. L.D.F.*, 445 S.W.3d at 830–32 (finding "more than enough evidence" of significant impairment under section 102.004 to establish grandmother's standing—father's mental-health diagnosis and hospitalizations, father's refusal to consistently take required psychiatric medication, child's distress when separated from grandmother, father's past drug use, and father's criminal history). Even indulging all record-supported, reasonable inferences to support the trial court's ruling, the Jacksons did not proffer satisfactory proof of Ann's significant impairment and, thus, did not meet their burden under section 102.004(b) to establish their standing to intervene seeking conservatorship.

### 2. Section 153.433(b)

The Jacksons alternatively relied on section 153.433(b) to establish their standing to intervene and seek possession or access to Ann. That section gives a trial court authority to grant a grandparent possession of or access to a child over a parent's objections if it specifies in the order that the grandparent overcame the parental presumption by providing a preponderance of evidence that "the denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being." Tex. Fam. Code Ann. § 153.433(b)(2); *see Derzapf*,

15

219 S.W.3d at 332 n.10. Section 153.433(b) does not confer standing on a grandparent to file an original SAPCR or to seek leave to intervene in a pending SAPCR; it provides for the specificity required in an order granting possession or access to a grandchild, including that the grandparent overcame the parental presumption by proving substantial impairment. Tex. Fam. Code Ann. § 153.433(b); *see Derzapf*, 219 S.W.3d at 331–32; *Swoboda v. Swoboda*, No. 03-09-00189-CV, 2009 WL 3151336, at *4 (Tex. App.—Austin Oct. 1, 2009, no pet.) (mem. op.); *Tope v. Kaminski*, 793 S.W.2d 315, 317 (Tex. App.—El Paso 1990, writ dism'd). But even so, the Jacksons did not show significant impairment by a preponderance of the evidence. *See* Tex. Fam. Code Ann. § 153.433(a)(2), (b)(2); *cf. In re Scheller*, 325 S.W.3d 640, 642–44 (Tex. 2010) (orig. proceeding) (per curiam) (concluding trial court abused its discretion by temporarily ordering access and possession under section 153.433(a)(2) because grandparent failed to show substantial impairment to overcome parental presumption). The Jacksons alleged no further grounds for standing in the trial court, and we are bound by their pleadings.[8]  *See In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 77 n.2 (Tex. App.—San Antonio 2011, pet. denied).

---

[8]In their mandamus response, the Jacksons argue that section 153.432 would also supply the needed standing to seek possession or access. Tex. Fam. Code Ann. § 153.432. They did not plead this ground for standing in the trial court. Further, section 153.432(c) also requires a showing of significant impairment to establish standing, rendering this section similarly unavailing to the Jacksons' standing. *Id.* § 153.432(c); *In re J.R.W.*, No. 05-15-01479-CV, 2017 WL 3083930, at *2 (Tex. App.—Dallas July 20, 2017, no pet.) (mem. op. on reh'g).

## B. DUMAS

As with the Jacksons' standing assertion, Dumas had the burden of proof to show his standing by a preponderance, and we indulge any reasonable inferences found in the evidence to support the trial court's ruling. *See I.I.G.T.*, 412 S.W.3d at 808; *In re A.B.O.*, No. 06-14-00071-CV, 2015 WL 2236593, at *3 (Tex. App.—Texarkana May 12, 2015, no pet.) (mem. op.); *C.E.M.-K.*, 341 S.W.3d at 77–78. To establish his standing to seek conservatorship, Dumas relied on the general family-code statute conferring standing to file an original conservatorship suit or an intervention petition on (1) "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition" or on (2) "a person with whom the child and the child's . . . parent have resided for at least six months ending not more than 90 days preceding the date of the filing of the petition if the child's . . . parent is deceased at the time of the filing of the petition." Tex. Fam. Code Ann. § 102.003(a)(9), (11); *see In re J.A.T.*, 502 S.W.3d 834, 837 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (recognizing section 102.003 applies to intervention petitions as well as original conservatorship actions).

### 1. Section 102.003(a)(9)

The supreme court has held the meaning of "actual care, control, and possession" required by section 102.003(a)(9) to be if, for a six-month period that ends not more than ninety days before the nonparent's intervention petition is filed,

17

"the nonparent served in a parent-like role by (1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children." *H.S.*, 550 S.W.3d at 160.

Before reviewing the factors to determine whether Dumas served in a parent-like role under section 102.003(a)(9), we address Clay's argument that the number of days Ann was physically at Dumas's house based on Clay and Wilkes's "very close to a 50/50 [possession] split" was less than the required six months. In the trial court, Clay relied on his self-made tracking calendars and testified that between September 12, 2017, and July 11, 2018, the maximum number of days that Ann was actually present at Dumas's home was 166. And at the hearing on Clay's motions to strike, Dumas seemed to agree that to get to "the 180-day mark," several days before the earliest date Wilkes and Ann could have moved in with him would have to be counted.

The general standing statute, however, clearly provides that the duration requirements in section 102.003(a)(9), (11), and (12) need not be continuous or uninterrupted but that the courts must consider the child's "principal residence" during "the relevant time preceding the date of commencement of the suit." Tex. Fam. Code Ann. § 102.003(b); *see In re B.A.G.*, No. 11-11-00354-CV, 2013 WL 364240, at *7 (Tex. App.—Eastland Jan. 31, 2013, no pet.) (mem. op.). As we stated before, Ann's principal residence is a component of whether Dumas had actual care,

18

control, and possession of Ann sufficient to show standing; thus, we will look to whether Ann's principal residence was with Dumas for the required time period and decline Clay's invitation to manually count which days Ann was physically present in Dumas's home. *See H.S.*, 550 S.W.3d at 156 (concluding that six-month period in section 102.003(a) does not confer standing on nonparents "who do not share a principal residence with a child for the statutory time period . . . regardless of how extensively they participate in caring for her"); *In re Fountain*, No. 01-11-00198-CV, 2011 WL 1755550, at *4 (Tex. App.—Houston [1st Dist.] May 2, 2011, orig. proceeding) (mem. op. on reh'g) ("In the absence of any requirement that a person with standing exercise *exclusive* care, control, or possession, the question of Katcher's statutory standing hinges on whether she exercised 'actual' care, control, or possession of the child." (emphasis added)); *Smith v. Hawkins*, No. 01-09-00060-CV, 2010 WL 3718546, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem. op.) ("Aunt's care, custody, control, and possession, while not exclusive, had been consistent over a substantial period of time. Nothing in section 102.003(a)(9) requires that care, custody, control, and possession be exclusive."). In short, we take the legislature at its word and do not consider whether Dumas's actual care, control, and possession was discontinuous or interrupted by the agreed custody order or by times Wilkes traveled with Ann without Dumas as asserted by Clay. *See B.A.G.*, 2013 WL 364240, at *5 ("Because the legislature instructed courts . . . to determine 'the child's principal residence' rather than requiring that the period be 'continuous and

19

uninterrupted,' it seems to have contemplated that foster parents, stepparents, and third-party caregivers are all parties who may not have exclusive or continuous custody.").

### a. Ann's principal residence

We now turn to Ann's principal residence during the disputed time period. A principal residence is a fixed place of abode that is occupied consistently over a substantial period of time and is permanent rather than temporary. *See In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.—Fort Worth 2008, orig. proceeding) (citing *In re M.P.B.*, 257 S.W.3d 804, 809 (Tex. App.—Dallas 2008, no pet.)); *cf. Snyder v. Pitts*, 241 S.W.2d 136, 140 (Tex. 1951) (orig. proceeding) (stating similar elements to determine residence for venue purposes).

On August 28, 2017, Wilkes, as was her right under the agreed custody order, notified Clay that she was designating Ann's primary residence to be at Dumas's home where they were moving.[9] Wilkes changed her driver's license to reflect Dumas's address as her own. Dumas's home was eleven miles farther from Clay's home than Wilkes's prior apartment. Dumas testified that Wilkes and Ann moved in

---

[9]We recognize that a primary residence is not the same as a principal residence; but we conclude that Wilkes's designation of Ann's primary residence for purposes of the agreed custody order is a fact to be considered in our principal-residence determination for standing. *See generally Doncer v. Dickerson*, 81 S.W.3d 349, 358–59 (Tex. App.—El Paso 2002, no pet.) (distinguishing right to designate child's primary residence in custody order from principal residence to establish standing under section 102.003(a)).

with him in August 2017[10] and remained for the next ten months. Ann had her own bedroom and bathroom in Dumas's house, and most if not all of Ann's clothes were kept in this bedroom. At the time of the hearing on Clay's motion to strike Dumas's intervention petition, Ann's bedroom remained as it was while she was still living at Dumas's home. Dumas estimated that before Wilkes's death, Ann generally spent five to seven nights each week at his home. Dumas and Wilkes's cat, Pumpkin, had always slept with Ann in this bedroom and after Wilkes's death, Pumpkin continued to sleep on the floor outside Ann's room.

### b. Providing for Ann's daily physical and psychological needs

Dumas produced evidence that he was involved in "all aspects" of Ann's life. He, Wilkes, and Ann were a "family unit," and Ann called Dumas "Pops." Ann considered Dumas's two daughters to be her sisters. Although Dumas did not normally attend Ann's doctor appointments, he assisted with her care and gave Ann her medicine. In one instance, Dumas insisted, over Wilkes's initial objection, that Ann be taken to a doctor on a Saturday when Ann had flu-like symptoms. He and Wilkes toilet trained Ann and helped her "overcome" a "set . . . back" she had after Clay spanked her for having an "accident."

---

[10]As we recognized earlier, the evidence was disputed about exactly when Wilkes and Ann moved in with Dumas—early August, August 28, or September 12, 2017—but even the latest move-in date was more than six months before Wilkes's July 11, 2018 death, which was when Dumas's asserted actual care, control, and possession of Ann ended.

Dumas was a part of Ann's "life and routine." On school mornings, Dumas made Ann's breakfast and they ate together. Dumas helped Ann get dressed before either he or Wilkes took her to preschool or to the Jacksons' home. After Ann, Wilkes, and Dumas returned home in the evenings, Dumas cooked, and the three would "eat dinner as a family." Dumas got Ann ready for bed and enforced Ann's television-time limit and bedtime. When Ann woke up in the middle of the night, Dumas got up with her and took her "back to bed with hugs and kisses." On the weekends, he, Wilkes, and Ann did family activities, such as swimming in the pool at their home, going "places[,] or just stay[ing] at home and snuggl[ing] on the couch."

### c. Exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents

Dumas was listed as Ann's emergency contact at her preschool, and he believed he had the right to "make decisions for her at school." Clay testified that Dumas had no legal authority to make any decisions for Ann, and Dumas admitted that only Clay and Wilkes had the legal right to make medical decisions for Ann. Dumas stated that he was "a decision maker for [Ann] as a parent." In fact, he had set Ann's bed time and had enforced it. He also enforced any punishments. In short, Dumas made "not only day-to-day decisions like what to have for dinner and when is bedtime . . . but [also] large decisions like education and other decisions." Wilkes did not have "veto power" when she and Dumas made decisions for Ann. In other words, Dumas was a co-parent with Wilkes and participated in Ann's parenting "[e]very day." When asked

22

what happened when he and Wilkes disagreed about parenting decisions, Dumas testified,

> We would talk about what was in the best interest of [Ann] and what we thought was best for the situation. And we didn't disagree very much on how to parent [Ann] or how to parent in general. So we would talk about it. And sometimes I would win out on what needed to happen, and sometimes [Wilkes] would win out.

### d. Holding regarding Dumas's actual care, control, and possession

We conclude that the evidence as a whole shows by at least a preponderance that Ann's principal residence for the required time period was with Wilkes and Dumas in Dumas's home. Dumas's home was a permanent home for Ann, and she lived there with Wilkes and Dumas as her designated, primary residence for approximately ten months—a substantial period of time for a preschooler—which ended less than ninety days before Dumas sought to intervene. During this time period, Dumas, along with Wilkes, regularly provided for Ann's daily physical and psychological needs and exercised guidance, governance, and direction to Ann as would be expected from a parent. Accordingly, Dumas met his burden to show his standing to intervene under section 102.003(a)(9) and seek conservatorship, and we cannot conclude that the trial court clearly abused its discretion by concluding Dumas had standing to intervene. *See, e.g.*, *H.S.*, 550 S.W.3d at 160–61; *In re Crumbley*, 404 S.W.3d 156, 159–60 (Tex. App.—Texarkana 2013, orig. proceeding); *C.E.M.-K.*, 341 S.W.3d at 75–78; *In re Y.B.*, 300 S.W.3d 1, 4–5 (Tex. App.—San Antonio 2009, pet. denied) (op. on reh'g). Again, our holding does not mean Dumas overcame the

23

parental presumption and will prevail on the merits of his intervention requests, only that he is entitled to be heard.

## 2. Section 102.003(a)(11)[11]

Dumas also alleged section 102.003(a)(11) to supply the necessary standing to intervene. This section required him to show by a preponderance that Wilkes and Ann resided with him for six months before Wilkes died. *See* Tex. Fam. Code Ann. § 102.003(a)(11). Again, this required time period does not have to be continuous but does have to be at Ann's "principal residence." *Id.* § 102.003(b). "Resided" in section 102.003(a)(11) has been defined as "living together in the same household." *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001).

For the reasons we discussed regarding section 102.003(a)(9), Dumas produced a preponderance of evidence that Ann and Wilkes moved in to his home as Ann's designated primary residence at the latest in September 2017, that his home was Ann's principal residence, and that they lived together in the same household until Wilkes's death in July 2018. Reasonable inferences can be drawn to support the trial court's implicit conclusion that Dumas established his standing under section 102.003(a)(11), which does not consider the merits of Dumas's conservatorship request.

---

[11]We address Dumas's alternate, alleged standing ground in an abundance of caution and because the trial court did not specify on which ground it based Dumas's standing.

### 3. Interference with Clay's Constitutional Right to Parent

Clay asserts that conferring standing on Dumas to intervene in the pending SAPCR under section 102.003(a)(9) or (11) violates Clay's constitutional right to parent Ann because there is no requirement that Dumas prove substantial impairment. *See generally Troxel v. Granville*, 530 U.S. 57, 60, 72–73 (2000) (plurality op.) (holding trial court's order granting grandparent visitation rights to their deceased son's daughters over mother's objection unconstitutionally infringed on mother's fundamental right to make decisions regarding daughters' care, custody, and control). Clay's argument has been rejected by the Texas Supreme Court:

> Parental rights are fundamental, but neither the Texas Family Code nor the Constitution treats them as plenary and unchecked. The Family Code [in section 102.003(a)(9)] recognizes that a narrow class of nonparents, who have served in a parent-like role to a child over an extended period of time, may come to court and seek to preserve that relationship, over a parent's objections. We hold that Grandparents [who filed a SAPCR petition to modify parents' conservatorship] fall into that class, although we express no opinion on whether Grandparents are entitled to conservatorship or visitation rights with respect to [their granddaughter].

*H.S.*, 550 S.W.3d at 154 & n.3, 163. Similarly, our conclusion that Dumas has shown by a preponderance that he has standing to intervene under the narrow confines of section 102.003(a)(9) or (11) does not unconstitutionally interfere with Clay's right to parent. And we express no opinion on whether Dumas is entitled to conservatorship.

25

## IV.  CONCLUSION

Dumas showed by at least a preponderance that he had standing under section 102.003(a)(9) and (11) to intervene in the pending SAPCR.  The trial court's denial of Clay's motion to strike Dumas's intervention petition was not an abuse of discretion and did not unconstitutionally interfere with Clay's right to parent Ann.  Accordingly, we overrule issues three, four, and five and deny Clay's petition in part as it relates to Dumas.  *See* Tex. R. App. P. 52.8(a).

But the Jacksons provided less than a preponderance of evidence that Clay's sole managing conservatorship would significantly impair Ann's physical health or emotional development.  By failing to proffer satisfactory proof under section 102.004 (or under section 153.433(b) to the extent it is applicable to a standing determination), the Jacksons did not meet their burden to establish their standing to intervene requesting conservatorship, possession, and access, rendering the trial court's denial of Clay's motion to strike their petition a clear abuse of discretion.  Therefore, we sustain Clay's first and second issues.  We conditionally grant Clay's petition in part as it relates to the Jacksons' standing to intervene.  *See* Tex. R. App. P. 52.8(c).  We direct the trial court (1) to vacate that portion of its November 20, 2018 order denying Clay's motion to strike the Jacksons' petition to intervene and (2) to enter an order granting this motion.  We are confident the trial court will comply and we will issue our writ only if the trial court does not.  We vacate our December 18, 2018 order staying the trial court proceedings.  *See* Tex. R. App. P. 52.10(b).

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: February 12, 2019