

# NUMBER 13-22-00219-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF K.L.C., A CHILD

On appeal from the 105th District Court
of Nueces County, Texas.

## OPINION

**Before Justices Tijerina, Silva, and Peña
Opinion by Justice Silva**

This appeal arises out of a trial court's final order on a petition to modify the parent-child relationship for the minor child Kaylee.[1] By two issues, Quincy, Kaylee's father, argues: (1) Martin, Kaylee's grandfather, lacked standing to file the petition to modify; and (2) there was insufficient evidence to overcome the fit-parent presumption that Quincy is able to act in Kaylee's best interest. We reverse and remand.

---

[1] We refer to the parties and child by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2), cmt.

## I.  BACKGROUND

## A.  Procedural Background

On April 17, 2014, the trial court entered an agreed order in a suit affecting the parent-child relationship (SAPCR) that appointed Quincy and Kelly, Kaylee's mother, as joint managing conservators of Kaylee. The order established child and medical support obligations for Quincy and a standard possession order over Kaylee. *See* TEX. FAM. CODE ANN. § 153.312 (establishing a standard possession order for parents who reside less than 100 miles apart). Kelly was provided the exclusive right to designate Kaylee's primary residence without geographic restriction.

On February 19, 2016, Quincy filed a petition to modify the parent-child relationship. Kelly filed her answer on March 28, 2016. The trial court ordered the parties to mediation on April 13, 2016. Quincy and Kelly signed a mediated settlement agreement on May 18, 2016. On July 12, 2016, the trial court entered the first agreed order modifying the parent-child relationship, which established a modified possession order over Kaylee. According to the order, Kelly would have possession of Kaylee every Monday and Tuesday, Quincy would have possession every Wednesday and Thursday, and the parties would alternate possession every Friday, Saturday, and Sunday. The order also terminated Quincy's child support obligation.

On February 19, 2018, Martin filed a petition in intervention seeking sole or joint managing conservatorship of Kaylee, alleging that Quincy and Kelly "engaged in a history or pattern of child neglect." On October 5, 2018, the trial court entered a second order

2

modifying the parent-child relationship,[2] which appointed Quincy, Kelly, and Martin as joint managing conservators over Kaylee. Martin was provided the exclusive right to designate Kaylee's residence, subject to a one-year probationary period wherein Kelly would take over that right if she complied with certain conditions.[3] The order purported to provide Quincy with the same possession and access schedule as the July 12, 2016 order, but provided Martin with possession on the first and third Sunday between 12:00 p.m. and 6:00 p.m. Quincy was able to override Martin's Sunday possession if he provided two-weeks' written notice. Kelly was provided the right to possession of Kaylee at all times not specifically designated for Quincy. The order did not include a finding that either Kelly or Quincy were unfit parents.

On September 25, 2020, Martin filed another petition to modify the parent-child relationship. Martin filed his first amended petition to modify three days later. The first amended petition requested the following changes:

- Martin be appointed as the person with the exclusive right to designate Kaylee's residence without regard to geographic restriction;

- Martin have the exclusive right to make educational, medical, and psychological decisions for Kaylee;

- Kelly and Quincy's periods of possession be supervised and "only be exercised in the county in which [Kaylee] resides at any given time"; and

---

[2] The order was titled "Agreed Final Order in Suit to Modify Parent-Child Relationship," but noted that Quincy failed to appear, and he did not sign the order.

[3] As we discuss in more detail in the factual background, Martin returned Kaylee to Kelly about three months after the order was entered.

3

- "Respondent" be ordered to pay child support.

Quincy filed a general denial. In October 2020, the parties entered into a mediated settlement agreement for temporary orders wherein Kaylee would reside with Martin and Quincy would have a modified possession order, providing him periods of possession of Kaylee every second and fourth weekend, certain holidays, and forty-two days during Kaylee's summer break. Kelly was only provided specific possession of Kaylee for Mother's Day weekend. The trial court appointed an amicus attorney "to assist the [trial court] in protecting the best interests of the child."

Trial proceeded on November 8, 2021, via Zoom. On April 26, 2022, the trial court entered a final order that found both Quincy and Kelly to be unfit parents, but nonetheless appointed Martin and Quincy as joint managing conservators over Kaylee. Although the order did not specifically state what conservatorship, if any, Kelly was appointed as, she was subsequently referred to as a joint managing conservator in the order when identifying her rights and duties. Martin was provided the exclusive right to designate Kaylee's residence without regard to geographic restriction. Quincy was provided a standard possession order while Kelly was provided three hours of supervised visitation on each Saturday that Martin has possession of Kaylee. Neither parent was ordered to provide child support, but Quincy was ordered to reimburse the State for Kaylee's state-provided medical and dental insurance. It is from this order that Quincy appeals.[4]

---

[4]We note that two exhibits offered by Martin and admitted by the trial court are not included in the court reporter's record. We requested that the reporter supplement the record with the exhibits, but she notified this Court that the exhibits were never provided to her as the trial occurred over Zoom. The reporter was unsuccessful in obtaining additional copies; accordingly, we abated the appeal for the trial court to make findings pursuant to Texas Rule of Appellate Procedure 34.6(f). *See* TEX. R. APP. P. 34.6(f). In response, Quincy filed a motion asking this Court to consider the matter with the record before us so that his right to appeal is not prejudiced by Martin's failure to ensure the exhibits were properly admitted and

**B.    Factual Background**

At trial, three witnesses testified: Martin, Quincy, and Quincy's mother (Grandmother).[5] Below is a summary of each witnesses' relevant testimony.

**1.    Martin**

Martin testified that he lives in a home with his common-law wife and Kaylee in Ingleside, Texas. Martin explained that he became Kaylee's primary caregiver because Kelly "wasn't capable at the time" and Quincy "said he didn't want her, he couldn't afford her." Martin elaborated that Kelly was using illegal substances and needed to get clean and sober before she could care for Kaylee. Martin stated that he allowed Kaylee to move back with Kelly three months after the October 2018 order because Kelly completed drug rehabilitation, got married, had another child, and was overall doing better. However, at time of trial, Martin did not believe Kelly was capable of taking care of Kaylee, alluding to current drug use and untreated mental health disorders.

Regarding Quincy, Martin testified that he resides in "a rundown dilapidated shack," but acknowledged he had not seen the inside of the home.[6] Martin described Quincy as immature, explaining that Quincy uses a lot of profanity, throws "temper tantrums," and has not "step[ped] up and be[en] a father and do what he's supposed to

---

filed. Having received no response from the trial court for thirty days, we granted Quincy's motion to consider the matter with the record before us and reinstated the appeal. *See id.*

[5] Although Kelly appeared and participated in the trial pro se, when she asked to call a witness, the trial court denied her the ability to do so.

[6] During trial, Martin, presumably showing a photo to the amicus attorney, asked, "Can you see that?" When the amicus attorney answered affirmatively, Martin then said, "That's his home. Do you see— do you see how it's dilapidated and falling apart?" However, no photos of the home were offered or admitted into the record. Later, during Quincy's testimony, he used his computer to show the trial court Kaylee's room at the request of the amicus attorney, but again no photos or other exhibits were admitted.

do." According to Martin, Quincy called or texted to check on Kaylee only twice since the temporary orders, both times "in the very beginning." However, Martin agreed that since the mediated settlement agreement, Quincy only missed some visits in October 2021 because Martin and his wife contracted COVID-19. Martin expressed dissatisfaction that Quincy did not call or message to check on Kaylee when they had COVID-19.

Martin described an event wherein Quincy brought his other daughter to Martin's home and "his then three-year-old [daughter] was allowed to run rampant in the house, completely tearing the house apart, throwing things everywhere, beating on things." At some point, Martin heard a scream and noted that Quincy did not get up to check on his daughter, who had fallen down the stairs.

Martin testified that after Kaylee returned to him from a forty-two-day visit with Quincy, he had "a really difficult time with her."[7] Because of that, he reached out to Quincy's mother for help. Martin was questioned if he asked Grandmother to take Kaylee indefinitely, but he denied doing so.

### 2.     Quincy

Quincy moved to Waco nearly three years before trial; prior to that he had lived in Ingleside and Aransas Pass. At the time of trial, Quincy was employed full time supervising the powder coating shop for a "middle-sized" company, earning $20 per hour. Quincy testified that the photo depicting his allegedly dilapidated home was actually a photo of where he works, which is next door to his home. Quincy's work schedule would allow him to drop off and pick up Kaylee for school every day and enroll her in after-school

---

[7] Martin did not elaborate on what he meant by having a "really difficult time" with Kaylee.

programs, if necessary. Quincy denied that his home was in poor condition but explained that he was in the process of having another home prepared for him to live in that had four bedrooms.

Quincy described his relationship with Kaylee as "very good," explaining that they "are very close, and . . . always had a pretty close relationship throughout her whole life." However, when Quincy first moved to Waco, Grandmother "shared [his] side of the custody and helped [him] out there, so [he] still stayed in contact with [Kaylee] quite a bit through [Grandmother]." Quincy continued to visit "for every birthday and all Christmases." Quincy asserted that he had not been involved in Kaylee's education or medical care because Martin refused to give him any information, including which school she attended or physician she saw. According to Quincy, Martin would not communicate with him, only with Grandmother.

Quincy agreed that since the temporary order was entered, he exercised every visitation except when Martin and his wife had COVID-19 in October 2021. Quincy recalled that his forty-two-day visit with Kaylee "started out extremely rough" but that "it ended really well." Quincy explained that when he, Kaylee, and his other daughter returned home from a water park, law enforcement was waiting for him because Martin called complaining that Quincy did not allow Kaylee to talk to Martin on the phone that day. Quincy testified that, Kaylee did not respond well to the incident, causing her to struggle with sleep and wet the bed the night law enforcement was called. Quincy further stated that Kaylee has expressed the desire to live with him instead of Martin and often cries when leaving Quincy's home to return to Martin.

Although Quincy believes it is important for Kaylee to have a relationship with her mother, he expressed that any visitation between the two should be supervised and that Kelly would need to demonstrate her sobriety through drug testing. Quincy is also the primary caregiver for his other daughter, who was four years old at the time of trial. Each daughter would have their own bedroom if Kaylee lived with him.

### 3. Grandmother

Grandmother testified that she had been extensively involved in Kaylee's life, including having possession of her every Tuesday evening into Wednesday and Saturday afternoon through Sunday during the 2018 order. More recently, Grandmother would transport Kaylee to and from her visits with Quincy, sometimes all the way while other times only meeting halfway. Grandmother confirmed that when she was in possession of Kaylee, Quincy would call or video chat with Kaylee regularly. According to Grandmother, Quincy and Kaylee have a positive relationship. Grandmother described Quincy as a good father.

## II. STANDING

By his first issue, Quincy challenges Martin's standing to bring a suit to modify the parent-child relationship.

## A. Applicable Law and Standard of Review

"[S]tanding involves a threshold determination of whether a [party] has a sufficient 'justiciable interest' in the suit's outcome to be entitled to a judicial determination." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). Standing in a SAPCR is governed by the Texas

8

Family Code.[8] *Id.* Standing to file an initial suit is generally governed by § 102.003(a), which lists fifteen scenarios in which a person would have standing to file an original SAPCR. TEX. FAM. CODE ANN. § 102.003(a). In addition, the family code sets out a scenario where a grandparent or other person would have standing to file an original SAPCR or intervene in an already-pending one. *See id.* § 102.004.

However, the family code provides additional standing provisions specific to suits to modify a SAPCR. Relevant here, "[a] party affected by an order may file a suit for modification in the court with continuing, exclusive jurisdiction." *Id.* § 156.002(a). "[A] party 'affected by' [an] order" encompasses an individual who was previously granted visitation rights, including intervenors to the original suit. *Moreno v. Perez*, 363 S.W.3d 725, 744 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *In re S.A.M.*, 321 S.W.3d 785, 789–90 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (concluding that "party" as used in § 156.002(a) "requires that the person have been a party to the order that the person seeks to modify").

"Standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that we review de novo." *In re H.S.*, 550 S.W.3d at 155. "Because standing to bring a SAPCR is governed by statute, we apply statutory-interpretation principles in determining whether a plaintiff falls within the category of persons upon whom such standing has been conferred." *Id.*

## B.   Analysis

Quincy argues that the only possible provisions that would provide standing to

---

[8] SAPCRs include both original suits and modifications.

Martin are § 102.003(a)(9) or § 102.004(a)(1). *See* TEX. FAM. CODE ANN. §§ 102.003(a)(9) (providing standing for a person who as had actual, care, control, and custody of a child for at least six months), 102.004(a)(1) (providing standing for a relative within the third degree of consanguinity if the child's circumstances would significantly impair their physical health or emotional development). Further, Quincy asserts that Martin failed to present evidence meeting the requirements of either statute. However, both §§ 102.003(a)(9) and 102.004(a)(1) relate to standing to file an *original* suit, whereas the petition before the court was a suit to modify. *See id.* §§ 102.003(a)(9), 102.004(a)(1). Thus, the appropriate section to apply would be § 156.002(a). *See id.* § 156.002(a). Quincy does not argue that Martin was not a party to the previous order and any such argument would be quickly overcome by a review of the record. Martin was appointed as Kaylee's joint managing conservator in the 2018 order—the order sought to be modified. *See Moreno*, 363 S.W.3d at 744; *In re S.A.M.*, 321 S.W.3d at 789–90. Accordingly, we conclude that Martin had standing to seek a modification to the 2018 order. Quincy's first issue is overruled.

## III. FIT-PARENT PRESUMPTION

By his second issue, Quincy argues that Martin failed to present sufficient evidence to overcome the fit-parent presumption.

### A. Applicable Law

The fit-parent presumption is a Constitutional protection of a parent's fundamental right to make decisions concerning the care, custody, and control of their child. *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 66

10

(2000) (plurality opinion)); *see* TEX. FAM. CODE ANN. § 153.131(b) (creating "a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child"). "Accordingly, 'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *In re C.J.C.*, 603 S.W.3d at 812 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). In other words, absent a showing that a parent is unfit, a court may not enter an order interfering with that parent's right to care, control, or custody of their child in favor of a nonparent. *See id.* at 811–14. In 2020, the Texas Supreme Court concluded that the fit-parent presumption applies equally to modification proceedings. *Id.* at 818–19. The presumption applies in any modification where a parent was named as a managing conservator of the child. *In re B.B.*, 632 S.W.3d 136, 139 (Tex. App.—El Paso 2021, no pet.) (citing *In re C.J.C.*, 603 S.W.3d at 819).

Generally, to overcome the fit-parent presumption, a nonparent must prove "'at a minimum' that the physical health or emotional well-being of the child . . . would be significantly impaired if the nonparent were not granted custody." *In re J.O.L.*, 2023 WL 2290300, at *4 (Tex. App.—San Antonio March 1, 2023, pet. filed) (quoting *In re N.H.*, 652 S.W.3d 488, 497 (Tex. App.—Houston [14th Dist.] 2022, pet. filed)); *see also In re D.D.L.*, No. 13-22-00062-CV, 2022 WL 3652496, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 25, 2022, no pet.) (mem. op.) (requiring evidence of specific identifiable behavior or conduct that will probably result in significant impairment to the child's physical health or emotional well-being). Such identifiable behavior or conduct may include "[p]hysical abuse, severe neglect, abandonment, drug or alcohol abuse, or

11

immoral behavior on the part of the parent." *Rolle v. Hardy*, 527 S.W.3d 405, 420 (Tex. App.—Houston [1st Dist.] 2017, no pet.)*.*

"A nonparent cannot meet his burden by evidence showing that he would be a better custodian of the child[], that he has a strong and on-going relationship with the child[], or that the parent would not have been a proper custodian in the past." *Id.*; *see Troxel*, 530 U.S. at 72–73 ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child[-]rearing decisions simply because a state judge believes a 'better' decision could be made."). "'[L]ingering sadness' from lack of contact with [a] grandparent[] [does] not sufficiently demonstrate significant harm to [a] child[] . . . ." *In re Scheller*, 325 S.W.3d 640, 643 (Tex. 2010). Nor do frequent visits between grandparents and grandchildren, a grandparent's attendance at the children's school activities or other events, or the children saying they miss the grandparents and want visitation. *In re J.M.G.*, 553 S.W.3d 137, 143 (Tex. App.—El Paso 2018, orig. proceeding); *see In re H.L.*, 613 S.W.3d 722, 726–27 (Tex. App.—Fort Worth, 2020, no pet.).

## B. Standard of Review

"We review a trial court's order regarding child custody, control, possession, and visitation for an abuse of discretion." *In re H.N.T.*, 367 S.W.3d 901, 903 (Tex. App.—Dallas 2012, no pet.); *see also Ruiz v. Norris*, No. 13-17-00032-CV, 2018 WL 5987165, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 15, 2018, no pet.) (mem. op.). "A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles." *In re H.D.C.*, 474 S.W.3d 758, 763 (Tex. App.—Houston [14th

12

Dist.] 2014, no pet.). Legal and factual sufficiency are not independent grounds of error in a child custody order but are relevant factors in determining whether the trial court abused its discretion. *Id.* If there is some evidence of a substantive and probative character that supports the trial court's order, then there is no abuse of discretion. *Id.*

When reviewing a legal sufficiency or no-evidence challenge, we should sustain the challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *see also In re V.N.S.*, No. 13-07-00046-CV, 2008 WL 2744659, at *3 (Tex. App.—Corpus Christi–Edinburg July 3, 2008, no pet.) (mem. op.). "To assess factual insufficiency, we look at whether the trial court's finding is 'so against the great weight and preponderance of the evidence as to be manifestly wrong.'" *In re E.S.S.*, 658 S.W.3d 613, 616 (Tex. App.—El Paso 2022, no pet.) (quoting *Wheeling v. Wheeling*, 546 S.W.3d 216, 223 (Tex. App.—El Paso 2017, no pet.)).

When the trial court has not entered findings of fact, such as here, we imply all findings necessary to support the judgment if they are supported by the evidence. *Rourk v. Cameron Appraisal Dist.*, 305 S.W.3d 231, 234 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.)

## C. Analysis

Because Quincy had previously been appointed a joint managing conservator and had not previously been found to be unfit, he benefits from the fit-parent presumption.

*See C.J.C.*, 603 S.W.3d at 819; *In re B.B.*, 632 S.W.3d at 139. However, the trial court found Quincy to be unfit; accordingly, we must review the finding for abuse of discretion. *See In re H.N.T.*, 367 S.W.3d at 903. The degree of proof necessary to overcome the fit-parent presumption remains unsettled. *See In re J.O.L.*, 2023 WL 2290300, at *3 (citing *In re C.J.C.*, 603 S.W.3d at 823 (Lehrmann, J., concurring)). But it is not necessary to settle that question now; Martin provided no evidence that Quincy was an unfit parent. *See id.*

The evidence presented by Martin regarding Quincy's parenting, construed in a light most favorable to the trial court's ruling, was conclusory and included unclear statements that Quincy has not "step[ed] up and be[en] a father," uses profanity, and is "immature." *See id.* at *4; *see also In re D.D.L.*, 2022 WL 3652496, at *4. Although Martin described Quincy's home as a "dilapidated shack," he acknowledged he had not seen the inside of the home and presented no specific evidence as to how or in what way the home would impair Kaylee's physical health or emotional well-being. *See In re J.O.L.*, 2023 WL 2290300, at *4; *see also In re D.D.L.*, 2022 WL 3652496, at *4. Martin presented no evidence that Quincy engaged in any conduct or behavior that would typically demonstrate a parent is unfit, such as physical abuse, neglect, abandonment, drug or alcohol abuse, or other immoral behavior. *See Rolle*, 527 S.W.3d at 420. In fact, Martin acknowledged that, aside from one visit that he refused to take Kaylee to, Quincy had attended every visit that was allowed of him.

At best, Martin testified to one incident that could be construed as calling into question Quincy's fitness: when Quincy brought his three-year-old daughter to Martin's

home during a visit and she fell down stairs. However, testimony that a three-year-old child was allowed to move about the home and fell cannot be said to qualify as evidence that Quincy is unfit, without more. *See Rolle*, 527 S.W.3d 420. Although Martin produced evidence that he had custody and control over Kaylee for significant periods of time, during which she seemed to be well cared for, such evidence does not overcome the fit-parent presumption. *See In re J.M.G.*, 553 S.W.3d at 143. Rather, the evidence that Martin produced goes to Kaylee's best interest rather than Quincy's fitness as a parent. *See id.* As such, the evidence Martin presented failed to show that Kaylee's physical health or emotional well-being would be impaired by Quincy's care or decision-making, let alone significant impairment. *See In re J.O.L.*, 2023 WL 2290300, at *4. There was legally insufficient evidence to support the trial court's finding that Quincy was unfit. *See In re H.D.C.*, 474 S.W.3d at 763. Accordingly, we conclude the trial court abused its discretion in appointing Martin as Kaylee's managing conservator and granting him possession and access. *See In re H.N.T.*, 367 S.W.3d at 903. We sustain Quincy's second issue.

**IV.    CONCLUSION**

We reverse the trial court's judgment and remand this case back to the trial court to enter an order in the best interest of the child that is consistent with this opinion.[9]

CLARISSA SILVA
Justice

Delivered and filed on the
6th day of July, 2023.

---

[9] Appellant's response to our abatement included three motions, which we carried with the case. Each of those motions are hereby denied as moot.

15